PHILIP E. MURPHY *vs.* OLD COLONY STREET RAILWAY COMPANY.

Bristol.    March 11, 1918. — May 25, 1918.

Present: RUGG, C. J., BRALEY, DE COURCY, CROSBY, & CARROLL, JJ.

*Negligence,* Employer's liability, In use of electricity.  *Electricity.  Evidence,*
Matter of conjecture.

In an action against a street railway corporation by an experienced lineman for
personal injuries sustained in the year 1907, when in the defendant's employ,
by falling from a pole by reason, as alleged, of coming in contact with the de-
fendant's telephone wires on a cross arm of the pole which had become charged
with a dangerous current of electricity alleged to have passed to them from
certain high tension wires maintained by the defendant on another cross arm
on the same pole, it appeared that when the plaintiff went on the pole the
current had been shut off from all the high tension wires, which thereby had
been made "dead" so that the place was safe to work in, and there was evi-
dence, introduced by the plaintiff, which, if believed, tended to show that
afterwards the current had been turned on upon a part of the high tension
wires, which in this way became alive and transmitted a part of the electricity
to the telephone wires with which the plaintiff was said to have come in con-
tact, but there was nothing to show how these wires became alive and it was a
matter of pure conjecture by whose order the current was turned on.  *Held,*
that there was no evidence of negligence for which the defendant was liable, it
being equally probable that the defendant was not at fault or that the dangerous
condition was caused by a fellow servant of the plaintiff for whose negligence
the defendant was not legally accountable to the  plaintiff.

In the case above described it was *said* that, there being no evidence to show negli-
gence of the defendant at common law or under the  employers' liability act,
it had become unnecessary to consider the question of the due care of the plain-
tiff in failing to use a safety belt with which he was provided or other questions
that had been raised at the trial.

TORT for personal injuries sustained on February 17, 1907, by a
fall from a pole of the defendant when the plaintiff was at work as
a lineman in the defendant's employ, the declaration containing
counts at common law and under the employers' liability act as
described in the opinion.  Writ dated June 3, 1907.

In the Superior Court the case was tried before *White,* J.  The
evidence is described in the opinion.  At the close of the evidence
the judge, granting a motion in writing to that effect filed by the
defendant, ordered a verdict for the defendant; and the plaintiff
alleged exceptions.

J. W. Cummings, (C. R. Cummings with him,) for the plaintiff.

E. P. Saltonstall, (J. T. Swift & C. W. Blood with him,) for the defendant.

CARROLL, J.   The plaintiff, an experienced lineman, while in the employment of the defendant, was injured severely by falling from a pole in Fall River, about 4 o'clock Sunday morning, February 17, 1907.   He contended that he was injured by reason of an electric shock and an electric burn on his heel, when in contact with the defendant's telephone wires, causing him to lose consciousness and fall; the defendant contended that the plaintiff did not receive a burn or shock, but fell by losing his balance while standing on a cross arm of the pole.   The judge ordered a verdict for the defendant.

The defendant operated an electric street railway from Quincy to Fall River.   The electric power was generated at Quincy and was carried to the several distributing or substations on high tension wires; the high tension line was controlled in the Quincy station and in the various substations by means of an oil switch and hand switches.   The substations were Rockland, Brockton, Bridgewater, Taunton and Fall River, — the Quincy station being at the extreme north and Fall River at the extreme south end of the line. The different lines had distinguishing letters and numbers, the initial letter of the station being used for the purpose, except in the case of Bridgewater, which was called W.   The line from Taunton to Fall River was No. 94TF.   The line generally consisted of three high tension wires on a double cross arm on the top of a high pole, two wires on one side of the pole and one on the other.   From Quincy to Brockton the line had six high tension wires.   On the same pole, and below the cross arm carrying the high tension wires, was a cross arm carrying four telephone wires (owned by the defendant) parallel to the wires above.   Two of these wires were on each side of the pole and constituted a telephone circuit, on each side, which was operated as a part of the defendant's system, one circuit being in regular use and the other a spare line.   On the pole where the plaintiff was injured the cross arm supporting the telephone wires was eight and one half feet below the high tension cross arm.

The power for the telephone wires came from dry batteries. With a portable hand service or test box the operator could tap the

wire and cause a bell to ring in the station. The system used for turning off the power for the safety of men working near the high tension equipment was known as the "red tag" system and was in substance this: The foreman having charge of the work to be done informed the operator in Taunton or Fall River, and asked him to have the particular line killed, giving his name, the line to be killed and the work to be done. This message was repeated by the operators and each operator wrote on a red tag the name of the station, the time the line was killed, and additional data. The tag was then tied to the operating handle, the oil switch was opened and the hand switches disconnected. The person giving the direction was then informed that the line was red tagged and safe for use. The tags were not to be removed until ordered off by the one who directed that the current be turned off. After a line was killed and before beginning work, a chain was thrown over the high tension wires, touching the ground making a short circuit.

The plaintiff began work a little after midnight. Before ascending the pole all the rules of the defendant were complied with by the foreman: the lines between Taunton and Fall River red tagged, the power shut off between these substations and the wires short circuited. When the plaintiff was injured there was no power in the high tension wires between these two places. A pole, which was a part of an old line and within fifteen feet of one of the new poles, had to be taken down and its equipment disposed of. The plaintiff and one Mitchell, a fellow employee, began at the top of the old pole, which was thirty feet high, and stripped it of the high tension wires (fastened to porcelain insulators), and removed the cross arm supporting them. Mitchell then descended and began to lower the telephone wires on one side of the pole. These wires on both sides were on insulators set on pegs. The plaintiff stood on the cross arm on the opposite side from Mitchell and cut the guy wires. He testified he unsnapped his safety belt (this belt had a ring in it on each side over the hip, with a strap to be fastened round the pole, and each end snapped into the ring, so that if one lost his hold, his fall would be retarded as he slipped down); that he saw a toe bolt on the pole and braced himself on the telephone cross arm, took a hatchet from his belt to strike the bolt, when he received a shock of electricity; that his next recollection was when he was in the hospital.

It was admitted that the plaintiff did not come in contact with any wires except those of the telephone; and there was no power in the high tension wires; "he had been handling them; . . . they were as dead as a door nail." There was evidence that under certain conditions a slight shock might be received from the telephone wires when the power was on the wires immediately above, but that this shock was not severe enough to cause a burn, nor could the electric force in the telephone wires which came from the dry batteries cause such a burn.

The plaintiff cannot recover simply because he fell. He bases his claim entirely on the fact that the power was on the high tension wires somewhere between Taunton and Quincy — notwithstanding the line was short circuited and the power off between Taunton and Fall River — because of the fact that the high tension line being parallel to the telephone wires a current was induced into them from the high tension wires which caused the burn and shock sufficient to throw him from the pole. He introduced evidence from two experts, as follows: "If there was a current flowing through the line at any point between Quincy and Taunton, and telephone wires parallel to those high tension wires it is quite possible that you might have very high potentials induced to the telephone wires." And the "shock and burn could be caused, if the power was off between Taunton and Fall River by some other part of the telephone line being in inductive relation to the high tension circuit."

The defendant's evidence showed that during the entire time the plaintiff was working the power was off on all the lines from Quincy to Fall River at the request of different employees in charge of work between the several stations; and the jury could have found that this was true, notwithstanding the error made by the Brockton operator in certain entries on the back of one of the red tags. The defendant contended that even if the power were on between some of the stations north of Taunton and at the generating station, the plaintiff could not receive a shock sufficient to cause a burn; that the telephone wires were four and one half inches above the cross arm, and standing on the cross arm the plaintiff's heels would not come in contact with them; that the parallel lines where Mitchell was standing contained no electricity; that if both the plaintiff's feet were against the wires and he was

exposed to the same electrical contact, if he was burned in one heel a burn would also appear in the other; and that, even if the telephone wires were charged with the induced electricity, they were transposed every five hundred feet and were therefore exposed to the same influence, and there would be no tendency for the current to flow from one wire to the other if the lines were at the same voltage. Further, that, if the plaintiff received an injury from the telephone wires, it would be expected that the fuse would blow out; no fuse did blow out; that the line was equipped with protectors and therefore a burn could not be received from these wires. The plaintiff produced testimony to show that he received an electric burn in one heel. This was denied by the defendant; and, in addition to other evidence to the effect that the mark on the plaintiff's heel was not such a burn, it appeared that when he was injured he had on woolen socks, shoes and overshoes, and there was no evidence that they showed any burn.

The electric shock received by the plaintiff could not have been caused by the current of electricity induced into the telephone wires from the high tension wires between Taunton and Fall River; the line was dead between these stations and the plaintiff admitted these wires had no power in them. He contended that the injury was caused by a current passing to the telephone wires from the high tension wires north of Taunton when the current was on somewhere between Quincy and Taunton.

When the plaintiff began work the telephone wires were dead; and during the night when he had occasion to handle them, they were in the same condition. Some time after midnight and before four o'clock in the morning — at which time the plaintiff was hurt — assuming his evidence to be true, the current from the high tension wires was induced into the telephone wires. This resulted either from the direction of some foreman or other employee who, under the defendant's rules, had the right to order the current on when the repair work was finished, or, from the negligence of some operator north of Taunton, who was a fellow servant of the plaintiff, in turning on the current when he had no right to turn it on unless directed to do so by the one who had previously ordered the current off.

A duty rested upon the defendant to furnish the plaintiff with a reasonably safe place to work. If, in accordance with its rules

and the "red tag" system, a foreman or other person delegated with authority to direct when the current should be on or off, ordered the current on at some place between Quincy and Taunton, it could be found that the defendant had failed to perform this duty. See *Hopkins* v. *O'Leary*, 176 Mass. 258; *Hooe* v. *Boston & Northern Street Railway*, 187 Mass. 67. If, however, the high tension wires north of Taunton became alive through the negligence of an operator or some other person acting without authority, and who was negligent in violating the rules, then the injury resulted from the negligence of a fellow servant; this was a risk which the plaintiff assumed and was one for which the defendant is not liable. If it be true that the plaintiff was injured by the negligence of such a fellow servant, he cannot recover under the second count of his declaration, which alleges defective appliances. *Siddall* v. *Pacific Mills*, 162 Mass. 378. *Grebenstein* v. *Stone & Webster Engineering Corp.* 205 Mass. 431. *McKenna* v. *Lynn Gas & Electric Co.* 219 Mass. 208.

The defendant introduced evidence, which was uncontradicted, that during the time the plaintiff was at work all the wires were dead and no current was passing from the generating station at Quincy; and produced the red tags showing this to be true. The jury could disbelieve this evidence, but, if they did and relied on the expert testimony of the plaintiff, there is nothing to show by whose direction the wires became alive; in the absence of any evidence bearing on this question, it is pure conjecture to say by whose orders the current was turned on. The place was safe to work in if the wires were dead, and the burden was on the plaintiff to show that it became unsafe by the negligence of the defendant. There was no evidence that it became unsafe from this cause, — by reason of some one acting in obedience to the defendant's rules, — it is just as probable that it became unsafe through the negligence of some one for whom the master was not responsible. To recover, the plaintiff must show that the cause which produced the result was one for which the employer was liable. It is not enough to show that the accident might have happened by reason of the employer's negligence when the same result might have occurred without any fault on its part; there must be at least some evidence to indicate it was in fault. This has not been shown; and there is. nothing in the case upon which a jury could find that the wires

were alive because of the defendant's negligence. Nor from the facts shown can any inference be drawn that the dangerous condition was caused by an employee for whose acts the master was responsible, as distinguished from the act of one for whose negligence, under the law, it was not responsible. See *Coin* v. *John H. Talge Lounge Co.* 222 Mo. 488; *Neal* v. *Chicago, Rock Island, & Pacific Railway*, 2 L. R. A. (N. S.) 905. The plaintiff, therefore, cannot recover under the second count.

The first count at common law alleges the defendant failed properly to warn and instruct the plaintiff. As has been said, he was an experienced lineman: he required no instructions concerning the danger of receiving a slight shock; nor was he entitled to a warning against the negligence of a fellow servant in turning on the current between Taunton and Quincy. *Siddall* v. *Pacific Mills, supra.* And see *Desautels* v. *Cloutier*, 189 Mass. 349; *Kelly* v. *Boston Elevated Railway*, 214 Mass. 461. He was entitled to a warning against an unknown danger; and if the wires became alive because the current was turned on in accordance with the rules of the defendant, it could be found that this was a peril unknown to him and he should have been instructed so that he could have guarded against it. The same difficulty arises under this count as under the second, — there was no evidence to show by whose act the wires became alive. It is true, upon the plaintiff's theory that the current could flow through these wires by the order or direction of a foreman or other servant having the authority to give this direction, in accordance with the defendant's "red tag" system, and in this way the potential might pass to the telephone wires; but unless this happened no warning was required. On the evidence it is just as probable that the wires became alive through the negligence of a fellow servant as by the negligence of a person having the right to order the current on. No breach of duty by the master, in failing to warn the servant of an unknown danger actually existing or which was likely to exist, is shown unless injury results from such danger, and there being no evidence as to the cause of the danger, the burden resting on the plaintiff has not been sustained. It follows that the plaintiff cannot recover under the first count.

The plaintiff also relied on two counts under the employers' liability act. As there was no evidence of a defect at common law,

no defect in the ways, works and machinery under the statute (R. L. c. 106, § 71, cl. 1) appeared, *McCafferty* v. *Lewando's French Dyeing & Cleansing Co.* 194 Mass. 412, 415. Nor was there any evidence of negligence by the superintendent, Kehoe, who did everything required by the rules, and had no knowledge of the danger of which the plaintiff complains. Even if it be assumed that Brooks, the foreman in charge, was a statutory superintendent, the evidence does not show that he was negligent. He gave the order to shut off the power between Taunton and Fall River, and this was done; the line was short circuited as required by the rules, and he informed the plaintiff the lines were dead. He is not shown to have had any knowledge that a current would be induced into the wires by turning on the power north of Taunton. If such a danger existed and it was caused by the negligence of the defendant, there was a duty to warn the plaintiff. But it was the personal duty of the master, *Jarvis* v. *Coes Wrench Co.* 177 Mass. 170, and was not and could not be delegated to the superintendent so as to relieve the defendant itself of this responsibility. When Brooks told the plaintiff the wires were dead, there was no power in them — they were in fact dead — and they remained in this condition for some time. If they afterwards became alive, this did not happen because of any negligence of Brooks.

As there was no evidence to show negligence of the defendant at common law and there can be no recovery under the employers' liability act, it becomes unnecessary to consider the question of the plaintiff's due care in failing to use the safety belt, and the other questions raised at the trial.

*Exceptions overruled.*